In re:

Lupton Consulting LLC, *et al.*,[1]          Case No. 20-27482-beh

            Debtors in possession.          Chapter 11
                                            Jointly Administered

## DECISION AND ORDER DENYING CONFIRMATION OF DEBTORS' PLAN

Two debtors that operate three fitness clubs seek confirmation of their combined Chapter 11 plan. The U.S. Trustee has objected on multiple grounds; the major lender has lodged a limited objection focused on injunctive provisions. While the managing member of these debtors vows to spend nearly heroic hours working to preserve the reorganization, confirmation must be denied based on multiple improper injunctive provisions that benefit insiders (and soon-to-be outsiders), vague and ultimately infeasible plan funding and distribution terms, and a lack of good faith as required by 11 U.S.C. § 1129(a)(3).

### FACTUAL BACKGROUND

**A.    The Debtors and their Principals**

Debtor Lupton Consulting, LLC is a sole-member LLC owned and managed by Lawrence Lupton. Debtor Anytime Partners, LLC is owned 50% by Mr. Lupton, and 50% by Darren Enger; Lupton acts as its managing member.

Together, the debtors currently operate three Anytime Fitness gyms in the Milwaukee area: (1) the "Milwaukee Gym" (located at 6015 West Forest Home Avenue, Milwaukee, Wisconsin 53220); (2) the "West Allis Gym" (located at 2229 S. 108th Street, West Allis, Wisconsin 53227); and (3) the "Hartland Gym" (located at 520 Hartbrook Drive, Hartland, Wisconsin 53029). Lupton

---

[1] Jointly administered with *In re Anytime Partners LLC*, Case No. 20-27483-beh.

Consulting operates the first two gyms, while Anytime Partners operates the third gym. Mr. Lupton owns the franchises for each of the three gyms.

When the debtors filed these cases, on November 16, 2020, debtor Lupton Consulting, LLC operated a third gym, located in Brookfield, Wisconsin. Lupton Consulting closed the Brookfield gym in December 2020. Prior to filing (up until the end of October 2020), the Brookfield gym was operated by another entity, DL2 Fitness LLC, of which Mr. Lupton and Mr. Enger were each 50% owners. Also up until the end of October 2020, Mr. Lupton and Mr. Enger co-owned another entity, DFIT LLC, which operated an Anytime Fitness gym in New Berlin, Wisconsin that closed that same month. DFIT LLC and DL2 Fitness LLC merged with Lupton Consulting, LLC on October 30, 2020 by filing Articles of Merger with the Wisconsin Department of Financial Institutions. Up until August 2020, debtor Anytime Partners, LLC operated another gym in Pewaukee, Wisconsin, which it closed that month.

Mr. Lupton operates and oversees the three remaining gyms on a daily basis. He testified that a "typical" gym is staffed by a district manager, a manager (possibly two managers), and three trainers. Lupton personally takes on the duties of the district manager, one of the managers, and one of the trainers, to keep his staff as slim as possible and remain profitable. According to Mr. Lupton, he works at the gyms on an average of at least six days a week, from 6:00 AM to midnight, with an hour break for dinner with his family. Mr. Enger testified that he has not been involved in the day-to-day operation of any of the gyms since early 2020.

**B.    The Debtors' Assets and Liabilities**

**1.    Lupton Consulting**

As of the petition date, Lupton Consulting, LLC owned personal property worth $413,307.48, consisting primarily of accounts receivable from gym members, gym equipment, and a 2019 Mercedes Benz GLC 530. Four creditors assert security interests in this property: Geneva Capital (a purchase-money security interest in the equipment); Mercedes-Benz Financial Services USA (a

purchase-money security interest in the vehicle); Byline Bank (a security interest in the debtor's personal property) and the United States Small Business Administration (a junior security interest in the debtor's personal property). These creditors filed secured claims against Lupton Consulting totaling $916,122.91.

Mr. Lupton and his wife Carolyne Lupton personally guaranteed the debt owed to Geneva Capital; Mr. Lupton personally guaranteed the debt owed to Mercedes-Benz Financial Services USA; and Mr. Lupton and Mr. Enger personally guaranteed the debt owed to Byline Bank, while Mr. Enger's wife, Laura Enger, also guaranteed the Byline Bank debt, but only to the extent of her interest in real property located at 321 East Wilson Street, Batavia, Illinois 60501, on which Byline Bank holds a Junior Mortgage, Security Agreement, Assignment of Leases and Rents, and Fixture Filing.

Lupton Consulting also owes debts to a handful of creditors holding unsecured claims: $1,660.25 to the Waukesha County Treasurer for personal property taxes owed to the City of Brookfield (*see* ECF No. 122-1, Ex. 100, at 22); $153,170.60 to BRE Retail Residual Owner 5 for the commercial lease of the former New Berlin gym location (*id.* at 23); and $22,725.84 to Cream City Property Management, LLC for the commercial lease of the former Brookfield gym location.[2] Mr. Lupton, Mr. Enger, and Dennis Cavanna (the individual from whom DFIT LLC purchased the New Berlin gym franchise) personally guaranteed the debt owed to BRE Retail Residual Owner 5 LLC. As of the petition date, Lupton Consulting also owed a contingent debt of $30,000 to the Small Business Administration for a Paycheck Protection Program (PPP) loan.

On Schedule G, Lupton Consulting disclosed several executory contracts and leases. One of those leases is for a 2020 Lexus RXL 350, and another is for a 2020 Mercedes GLE 350, both of which the debtor identifies as having 34 months remaining as of the petition date. Mr. Lupton is a co-lessee (and codebtor) on both of these leases. The monthly lease payment for the Lexus is

---

[2] *See* Case No. 20-27482-beh, *In re Lupton Consulting, LLC*, Proof of Claim No. 7-1.

$730.14 (*see* ECF No. 122-3, Ex. 102, at 134), and the monthly lease payment for the Mercedes is $945.23 (*see* ECF No. 122-19, Ex. 118). Lupton Consulting, LLC makes the lease payments for both of these vehicles. The lease agreement for the Mercedes (which Mr. Lupton completed) states that the primary intended use of the vehicle is "personal," instead of business, commercial, or agricultural purposes.[3]

Lupton Consulting, LLC also makes the payments on the 2019 Mercedes Benz GLC 530 identified above as the debtor's personal property, in the amount of $1,595.69 per month. The retail installment sale contract for the 2019 Mercedes indicates that the primary use for which the vehicle was purchased is "personal, family, or household," and also reflects that Mr. Lupton is a co-buyer and co-owner of the vehicle.

According to Mr. Lupton, the debtor pays for these three vehicles because he, his wife, and his teenage son use them to travel to the gyms. Although his wife and son are not employees, they spend time cleaning the clubs on a daily basis. Mr. Lupton testified that his wife and son do not track their hours, but estimated that his son spends four hours a day at one or more of the gyms—working out for two hours and cleaning for two hours—while his wife spends about two hours a day cleaning the gyms.

### 2. Anytime Partners

As of the petition date, Anytime Partners, LLC owned personal property worth $91,114.95, consisting primarily of accounts receivable from gym members and gym equipment. Two creditors assert security interests in this property: Geneva Capital (a security interest in miscellaneous gym equipment and office furniture and equipment); and Byline Bank (a security interest in the debtor's checking account, accounts receivable, and miscellaneous gym equipment). These creditors filed secured claims against Anytime Partners totaling $428,842.61. Both Mr. Lupton and Mr. Enger personally guaranteed Anytime Partners' debts to Geneva Capital and Byline Bank.

---

[3] The record does not contain a copy of the lease for the 2020 Lexus.

Anytime Partners owes unsecured debts to several creditors: $78,339.13 to Big Hand, LLC for rent due under the lease for the now-closed Pewaukee gym; $119,243.45 to David Taylor Fitness, LLC; $103,713.46 to Fitness Ventures, LLC; and $23,305.00 to DHCH Properties, LLC for past-due rent on the lease of the Hartland gym location. Mr. Lupton personally guaranteed the debt owed to all four of these creditors, while Mr. Enger guaranteed the debt to David Taylor Fitness, LLC.

As of the petition date, Anytime Partners also owed a contingent debt of $25,000 to the Small Business Administration for a PPP loan.

**C.    The Debtors' Prepetition Financials**

When Lupton Consulting, LLC filed its petition, it disclosed in its Statement of Financial Affairs (SOFA) that it had not made any payments or other transfers of property within a year of the petition date that benefited any insider (SOFA question 4), and that, within the year before filing, it had provided insider Mr. Lupton $80,000 in "[d]raws, repayment of loan, license to operate franchise, wages" (SOFA question 30). *See* Ex. 100 at 35, 39.

Based on Mr. Lupton's testimony at the 11 U.S.C. § 341 meeting of creditors, however, as well as the U.S. Trustee's review of the debtors' pre- and post-petition bank records, the U.S. Trustee became concerned with the accuracy of these disclosures and the commingling of the debtors' business expenses with the personal expenses of Mr. Lupton. The U.S. Trustee sought and obtained a Rule 2004 examination of Mr. Lupton to inquire into prepetition transfers between the debtors and insiders.

In March 2021, Lupton Consulting amended its SOFA to disclose additional prepetition transfers made to or for the benefit of Mr. Lupton. In response to question 4, the debtor disclosed that it had made payments of almost $330,000 that benefitted Mr. Lupton: the debtor paid four loans totaling $48,744.68 that Mr. Lupton had borrowed on behalf of the debtor, and paid $278,634.39 in charges that the debtor had incurred on Mr. Lupton's personal credit cards. *See* Ex. 100, at 71–72. Lupton Consulting also amended its

answer to SOFA question 30, disclosing that Mr. Lupton had received over $202,000 in compensation the year before the petition date, including $61,755.01 in salary, personal training compensation, and draws, plus an additional $140,618.48 in payments on Mr. Lupton's credit cards that included personal expenses of the Luptons in lieu of draws. The debtors explain their prepetition accounting practices as follows:

> The Debtors have never had access to lines of credit. Since their inception, Lupton has regularly injected cash into the Debtors, especially into Lupton Consulting LLC to provide liquidity and make the Debtors cash-flow. Lupton provided these cash injections from his own savings and loans that he took out with various banks and his own personal credit cards. Until recently, the Debtors were profitable and neither Lupton nor the Debtors tracked the injections.

ECF No. 122-6 (Ex. 105), at 2.

Mr. Lupton explained at the confirmation hearing that he had a personal account at BMO Harris Bank, which was linked to two of his "business" accounts, one of which he used for the Milwaukee gym, and one which he used for the West Allis gym. Because Mr. Lupton was unable to transfer funds between the two business accounts directly, any transfers between the two business/gym accounts first had to go through his personal account.

Also at the confirmation hearing, counsel for the U.S. Trustee submitted evidence demonstrating that at least $7,000 in Economic Injury Disaster Loan (EIDL) funds issued to Lupton Consulting, LLC, were transferred in May 2020 to Mr. Lupton's personal bank account and were used for his personal expenses. ECF Nos. 122-14 (Ex. 113); 122-15 (Ex. 114), at 7-12; 130 (Ex. 120), at 17.

**D. Reason for Bankruptcy Filing**

The debtors explain that the COVID-19 pandemic is the primary reason for their bankruptcy filings:

> In December 2019, Lupton Consulting, LLC opened the West Allis Gym. Doing so required a great deal of money to build out the space and to provide operating cash flow until it grew its

membership base to the point that it could support itself. Lupton provided these funds with the expectations that the West Allis Gym would recoup these losses within eighteen months. Unfortunately, the COVID-19 pandemic struck four months later.

Because the Debtors were considered "non-essential," they were unable to provide services to their members, causing the loss of many members and of income, especially in April and May 2020. Believing that the "shutdown" would be temporary and that things would be back to normal during the summer of 2020, Lupton Consulting, LLC used the [temporary] closure of the Milwaukee Gym, already one of the most successful Anytime Fitness locations in the Midwest, as an opportunity to upgrade and expand the facility. Lupton again provided much of the initial funds to complete the construction.

As the COVID-19 pandemic continued, the Debtors struggled to maintain memberships and to sign up new members. Prior to filing, the Debtors closed other Anytime Fitness franchises located in Pewaukee and New Berlin. After filing, Lupton Consulting, LLC closed the Brookfield Gym. The closing of these franchises [h]as allowed the Debtors to consolidate expenses and to move members to the West Allis Gym, making it profitable. The Debtors have also used the reprieve caused by filing these cases to formalize their operations and to remove their dependency on Lupton for making cash-flow.

Ex. 105, at 3.

### E.    The Plan

After obtaining several extensions of the deadline to file plans under Subchapter V, *see* 11 U.S.C. § 1189(b), the debtors filed a single plan of reorganization on April 30, 2021; they filed a slightly revised version of that plan on May 13, 2021, which is the version the debtors sent to creditors for balloting. *See* ECF No. 110.

### 1.    Treatment of claims and interests

The debtors' plan proposes to pay two groups of unclassified claims, *see* 11 U.S.C. § 1123(a)(1). These include administrative expenses (allowed attorneys' fees and costs, together with the Subchapter V trustee's fees and costs) and priority tax claims. The debtors' attorneys anticipate that their post-

petition fees and expenses will total approximately $42,000, *see* ECF No. 121, while the Subchapter V trustee anticipates fees of $2,250, *see* ECF No. 118. The debtors will pay $30,000.00 of these administrative expense claims on the effective date of the plan; the Subchapter V trustee's fees will be paid first, and, after applying the rest of the $30,000 to counsel's fees, the remaining balance of allowed attorneys' fees will be "paid over the following 12 months on a schedule to be agreed between the Debtor[s] and counsel." The priority tax claim of the Waukesha County Treasurer in the amount of $1,660.25 will be paid in full on the effective date of the plan.

The plan classifies the remaining claims into ten numbered classes. Class 1, which consists of priority claims not identified above, does not include any claims. The treatment of Classes 2 through 10 is described below.

| Class | Claim(s) | Amount of claim(s), per claims register or Sch. E/F | Plan treatment |
|---|---|---|---|
| 2 | Secured claims of Byline Bank | A fully secured claim of $495,473.36 against Lupton Consulting, LLC, and a fully secured claim of $256,377.09 against Anytime Partners, LLC, for a total of $751,850.45.[4] | The debtors propose to treat $277,998.45 of these claims as secured ($249,089.87 of the Lupton Consulting claim, and $28,908.58 of the Anytime Partners claim), and will pay the secured portions of the claims over 84 months, with monthly payments at 5% interest. In addition, "Byline Bank shall release any personal guarantees on its secured claims after receipt of the last payment made under the terms of this provision." |
| 3 | Secured claims of Geneva Capital, LLC | Secured claims of $264,183 against Lupton Consulting, LLC, and secured claims of | The debtors propose to treat $255,000 of these claims as secured ($180,000 of the Lupton Consulting claims, and $75,000 of the Anytime Partners claims), and will pay the secured |

---

[4] *See* Case No. 20-27482-beh, *In re Lupton Consulting, LLC*, Proof of Claim No. 6-1; Case No. 20-27483-beh, *In re Anytime Partners, LLC*, Proof of Claim No. 6-1. According to the ballots that Byline Bank submitted, however, the bank's total claim against Lupton Consulting is $466,327.10, and its total claim against Anytime Partners is $235,203.81, for a total of $701,530.91. *See* ECF No. 125-7 (Ex. 7), at 5–6. This reduction appears to be due to post-petition payments that the SBA made to Byline Bank on behalf of the debtors, *see* ECF No. 87.

| | | | |
|---|---|---|---|
| | | $172,465.52 against Anytime Partners, LLC.[5] | portions of the claims over 84 months, with monthly payments at 5.5% interest. In addition, "Geneva Capital LLC shall release any personal guarantees on its secured claims after receipt of the last payment made under the terms of this provision." |
| 4 | Secured claim of Mercedes-Benz Financial Services, LLC | A total claim of $51,062.08, of which $49,750.00 is secured, leaving an unsecured portion of $1,312.08.[6] | "This claim shall be paid according to its contractual terms with the Creditor." |
| 5 | Secured claim of Affirm Inc. | N/A. Per Lupton Consulting, LLC's amended Schedule D, Affirm, Inc. does not have a claim against the debtor, but holds a security interest in two Peloton stationary bikes that the debtor owns, but which were purchased and financed by Lawrence Lupton. | "This claim shall be paid according to its contractual terms with the Creditor." |
| 6 | Nonpriority unsecured claim of DHCH Properties, LLC | $23,305.00[7] | "The Debtors shall pay the claim in full on the Effective Date of the Plan as part of the assumption of the lease." |
| 7 | The nonpriority unsecured claims of four creditors: Big Hand, LLC; Cream City Property Management, LLC; David Taylor Fitness, LLC; and | Big Hand, LLC holds an unsecured claim of $78,339.13 against Anytime Partners, LLC; Cream City Property Management, LLC holds an unsecured claim of $22,725.84 against Lupton Consulting, LLC; David Taylor Fitness, LLC holds an unsecured claim of $119,243.45 against | The debtors will make one-time payments to each of these creditors on the effective date of the plan "in accordance with their agreements with each Creditor to release any personal guarantees they are holding, to satisfy any judgements against any guarantors, and to dismiss with prejudice any lawsuits pending against guarantors." |

[5] *See* Case No. 20-27482-beh, *In re Lupton Consulting, LLC*, Proof of Claim Nos. 3-1, 4-1, and 5-1 (claiming secured debts of $264,183 and unsecured debts of $87,219.05); Case No. 20-27483-beh, *In re Anytime Partners, LLC*, Proof of Claim Nos. 3-1 and 4-1 (claiming secured debts of $172,465.52 and unsecured debts of $5,213.87). In the ballots that Geneva Capital submitted, however, it quantified its secured claim against Lupton Consulting as $185,695.85, and its secured claim against Anytime Partners as $77,373.29, *see* Ex. 7, at 7, apparently agreeing to the debtors' lower valuations.

[6] *See* Case No. 20-27482-beh, *In re Lupton Consulting, LLC*, Proof of Claim No. 1-1.

[7] *See* Case No. 20-27483-beh, *In re Anytime Partners, LLC*, Proof of Claim No. 7-1.

| | | | |
|---|---|---|---|
| | Fitness Ventures, LLC | Anytime Partners, LLC; and Fitness Ventures, LLC holds an unsecured claim of $103,713.46 against Anytime Partners, LLC, for a total of $324.021.88.[8] | Big Hand, LLC will receive $28,000.00; Cream City Property Management, LLC will receive $2,500.00; David Taylor Fitness, LLC will receive $22,000.00; and Fitness Ventures, LLC will receive $18,000.00, for total payments of $70,500. |
| 8 | The nonpriority unsecured claims of four creditors: Byline Bank; Geneva Capital, LLC; the Small Business Administration based on the EIDL; and BRE Retail Residual Owner 5 LLC. | Byline Bank filed a fully-secured claim against each debtor (for a total of $751,850.45), but based on the debtors' treatment of those secured claims in Class 2 as being secured in the amount of only $277,998.45, this leaves unsecured portions of Byline Bank's proofs of claim in the amount of $473,852.[9]  Geneva Capital filed partially secured claims against each debtor (altogether totaling $529,081.44), of which the debtors propose to treat $255,000 as secured in Class 3 above, which leaves unsecured claims totaling $274,081.44 ($171,402.05 against Lupton Consulting, and $102,679.39 against Anytime Partners).[10]  The SBA holds an unsecured claim of $106,716.55 | "The Debtors shall make annual payments on the anniversary of the Effective Date of the Plan from the net operating income from the Gyms. The Debtors expect that each creditor shall be paid 25% of its allowed claim. The Debtors anticipate that on the first anniversary of the Effective Date, each creditor shall receive a pro rata share of the Debtors' net operating income, totaling 8/32s of a quarter of its allowed claim; that on the second anniversary, each creditor shall receive 12/32s of a quarter of its allowed claim; and on the third anniversary, each creditor shall receive 12/32s of a quarter of its allowed claim. These Creditors shall release any personal guarantees on their unsecured claims after receipt of the last payment made under the terms of this provision." |

---

[8] *See* Case No. 20-27482-beh, *In re Lupton Consulting, LLC*, Proof of Claim No. 7-1; Case No. 20-27483-beh, *In re Anytime Partners, LLC*, Proof of Claim Nos. 1-1, 2-1, and 5-1.

[9] The debtors' plan projections, however, estimate the unsecured portion of Byline's claims to be paid through the plan as $452,018.50 ($232,756.36 for Lupton Consulting, and $219,262.14 for Anytime Partners), while the total claim amounts identified in the ballots Byline submitted result in unsecured claims of $423,532.46 ($217,237.23 + $206,295.23), *see supra* note 4.

[10] Although the debtors' plan projections correctly calculate the amount of Geneva's unsecured claim against Anytime Partners as $102,679.39, the amount of the unsecured claim against Lupton Consulting is inexplicably calculated as only $116,661.09, rather than $171,402.05. *See* Ex. 105, at 17.

| | | | |
|---|---|---|---|
| | | against Lupton Consulting, LLC.[11]<br><br>Finally, although BRE Retail Residual Owner 5 did not file a proof of claim in either debtor's case, Lupton Consulting, LLC scheduled the amount of this debt on its Schedule E/F (Line 3.2) as $153,170.60, and did not list the claim as disputed, contingent, or unliquidated, *see* Fed. R. Bankr. P. 3003(b)(1).[12] | |
| 9 | Nonpriority unsecured claim of the Small Business Administration based on the PPP | N/A. The SBA did not file any proofs of claim based on the PPP loans, and although the debtors identify these loans in their schedules (together, $55,000), the claims are described as contingent. | "The Debtors have applied for forgiveness of their debts with SBA based on the Paycheck Protection Program's guidelines. If any portion of the claims are not forgiven, the claims shall be paid pro rata and at the same percentage with the unsecured claims in Class 8." |
| 10 | Equity security holders of the debtors | N/A | "The interests in the Debtors in Class 10 are unimpaired and unaffected under the Plan; they shall retain their interests." |

Notably, the plan does not provide for the prepetition legal fees of debtors' counsel ($4,803.65 owed by Lupton Consulting, LLC, and $1,376 owed by Anytime Partners, LLC, which constitute general unsecured claims), nor does it provide for the payment of a $1,106.02 claim filed by the Internal Revenue Service against Anytime Partners, LLC.[13] Although both Mr. Lupton and Mr. Enger testified that they do not believe Anytime Partners, LLC has a

---

[11] *See* Case No. 20-27482-beh, *In re Lupton Consulting, LLC*, Proof of Claim No. 9-1.

[12] The debtors' plan projections, on the other hand, list the amount of this claim as $240,529.96; although the Court questioned whether there was any support for this number in the record prior to the confirmation hearing, it was only in post-trial briefing that the debtors offered an explanation for this substantial discrepancy: "[T]he Plan assumes that BRE Retail Residual Owner 5 LLC shall file its Proof of Claim within 30 days of the Order Confirming Plan as allowed by Article 6 of the Plan and that the Claim shall include both its prepetition arrears of $153,170.60 along with the additional amounts allowed by § 502(b)(6(A)."

[13] *See* Case No. 20-27483-beh, *In re Anytime Partners, LLC*, Proof of Claim No. 8-1 (claiming a priority portion of $606.02).

tax liability (and that the IRS will amend the claim once Anytime Partners files its tax returns), the debtors have not objected to this proof of claim and the claim is entitled to *prima facie* validity. *See* Fed. R. Bankr. P. 3001(f).

Article 6 of the debtors' plan provides for the treatment of executory contracts and unexpired leases. It states:

> The Debtor assumes, and if applicable assigns, the following executory contracts and unexpired leases as of the effective date of the Plan:
>
> 1. Lease of 2020 Lexus RXL 350 with Lexus Financial Services.[14]
>
> 2. Lease of 2020 Mercedes-Benz GLE 350 CLA with Mercedes-Benz Financial Services USA.[15]
>
> 3. Lease of 2229 South 108th Street, West Allis, Wisconsin with Lincoln Plaza A LLC and Lincoln Plaza B LLC.[16]
>
> 4. Lease of 6015 West Forest Home Avenue, Milwaukee, Wisconsin with Sunnyvale, LLC. [17]
>
> 5. Lease of 520 Hartbrook Drive, Hartland, Wisconsin with DHCH Properties, LLC. [18]
>
> 6. Licenses to operate three Anytime Fitness Franchises (the Milwaukee, West Allis, and Hartland Gyms) with Lawrence Lupton.
>
> The personal guarantees associated with the assumed leases and executory contracts shall remain unaffected by the Plan.

Ex. 105, at 10–11.

The debtors specifically reject the unexpired leases with BRE Retail Residual Owner 5 LLC; Big Hand, LLC; and Cream City Property Management, LLC.

---

[14] Although not identified in the plan, the lessee on this lease is Lupton Consulting.

[15] Although not identified in the plan, the lessee on this lease is Lupton Consulting.

[16] This is the lease for the West Allis gym, of which Lupton Consulting is the lessee.

[17] This is the lease for the Milwaukee gym, of which Lupton Consulting is the lessee.

[18] This is the lease for the Hartland gym, of which Anytime Partners is the lessee.

### 2. Liquidation analysis

The debtors assert that no amount would be available for unsecured creditors in the event that the debtors' assets were liquidated, explaining: "Due to the security agreements that the Debtors have with Byline Bank, the SBA, and Geneva Capital, all of the assets of the Debtors would be consumed, in the event of a liquidation, by those claims." Ex. 105, at 2. The debtors add that their main assets are the accounts receivable due on the contracts with the gym members through Anytime Fitness, LLC, and "[s]hould a liquidation occur, the Debtors would lose access to those funds as they would be unable to provide a gym location for the members paying those funds." *Id.*

Although the debtors admit that, within the year before filing, Lupton Consulting, LLC repaid $327,379.07 in debts that Mr. Lupton had incurred to finance the debtor, as well as over $200,000 to Mr. Lupton in salary, direct draws, and the payment of personal credit card expenses in lieu of direct draws, *see supra* Section C, the debtors "believe that the payments made to Lupton either directly through draws/wages or indirectly through the payment of debts incurred by Lupton would not be recoverable based on the defenses provided by 11 U.S.C. § 547(c)(1) and (2)" (transfers made in the ordinary course of business). *Id.*

### 3. Plan funding and future operations

The debtors propose to fund their plan through (1) a $20,000 cash contribution from Darren Enger to Anytime Partners, LLC, and (2) cash on hand and future net operating revenue earned from operation of the gyms.

The $20,000 contribution from Enger is to be made concurrently with the execution of a bill of sale between the debtors: "Seven days prior to the Effective Date of the Plan, the Debtors shall execute a bill of sale so that Lupton Consulting LLC purchases the assets of Anytime Partners, LLC in exchange for assuming the liabilities of Anytime Partners, LLC," after which Anytime Partners will dissolve as a corporate entity. Ex. 105, at 12. Mr. Lupton testified that the bill of sale contemplated by the plan has not been drafted,

and that the only asset to be sold is Anytime Partners, LLC's interest in membership contracts, which he estimated to be worth $20,000. Lupton described the purpose of Enger's $20,000 contribution as being "to help offset his release of guarantees."

As of the confirmation hearing, Enger had not yet set aside or deposited the $20,000 payment in a trust account. Enger testified that he currently does not have the means to make the payment; instead, if the plan is confirmed, he will borrow $20,000 from someone "close" to him, who agreed to loan him the funds on the condition that Enger repay the money within 60 days. Enger intends to obtain the funds to repay the $20,000 by refinancing his commercial real property in Batavia, Illinois. Byline Bank holds a second mortgage on this property, which serves as collateral for Byline's loans to Lupton Consulting. Enger estimated that there is about $80,000 of equity in the property to which Byline's mortgage attaches. Enger presently is unable to refinance the property because of Byline's mortgage.

The debtors propose to fund the remainder of their plan payments with operating revenue from the gyms. Attached to the plan is a set of financial projections from April 2021 through June 2024, purporting to show the debtors' ability to make the required payments. The U.S. Trustee questions the reliability of these projections on several grounds, as well as the necessity of some of the budgeted expenses; later in this decision, the Court will address the specifics of the U.S. Trustee's concerns in analyzing whether the plan is feasible or proposed in good faith.

As for future operations of the debtors, the plan provides: "Lupton shall continue to manage the Debtors post-confirmation and shall continue to be compensated through regular wages as he is currently." Ex. 105, at 2. Although the plan itself does not identify the amount of those wages, Mr. Lupton testified that his salary currently is between $9,000 and $10,000 per month (which may increase with inflation), and he also receives commissions from signing up new gym members, as well as personal training income. According to a payroll report run on July 2, 2021, from January 1, 2021 to

date, Mr. Lupton had earned $57,000.06 in regular wages, $2,860.00 in commissions from signing up new gym members, and $6,750 in personal training income. ECF No. 126 (Ex. 110), at 7.

Mr. Lupton's previously reported "total draw" for 2019 was $74,766.95, and his "total draw/salary" for 2020 (through the mid-November filing date) was $91,569.22. *See* ECF No. 122-7 (Ex. 106).

### 4.    Third-party releases and injunctions

Finally, Article 10 of the plan includes the following provisions concerning certain debts guaranteed by non-debtor third parties:

> **10.1. Extinguishment of Liens.** Except as otherwise provided by this Plan, all liens securing the claims against the Debtors, their Estates, or Guarantors shall be extinguished on the Confirmation Date.
>
> **10.2. Injunction.** Except as provided for by this Plan, after the Confirmation Date, all holders of claims against the Debtors or their assets are enjoined from any actions against Lawrence Lupton, Carolyne Lupton, Darren Enger, Laura Enger, and Dennis Cavanna or their property as co-debtors or guarantors of the Debtors, during the term of the Plan. Except as provided for by this Plan, upon the successful completion of the Plan, all holders of claims against the Debtors or their assets are permanently enjoined from any actions against Lawrence Lupton, Carolyne Lupton, Darren Enger, Laura Enger, and Dennis Cavanna or their property as co-debtors or guarantors of the Debtors.

Ex. 105, at 14–15.

The Plan provides no disclosure of what "the claims" identified in Article 10.1 include, nor is the term "Guarantors" defined.

Mr. Lupton testified that the importance of the releases "is to be able to operate and run the clubs without worrying about a personal guaranty associated with a lease or a location that I no longer operate. . . . Due to COVID, . . . we were forced out of the facility, out of the space, and to be attached to a personal guaranty on that space doesn't seem fair, it's not right and . . . to continue to operate the business I've got to get released on the guarantees." Mr. Lupton also suggested that if the releases were not approved,

either he or Lupton Consulting , LLC would file a Chapter 7 bankruptcy petition (specifically, Lupton said "I would file a Chapter 7 and I would pay $0 and Lupton Consulting would go out of business and creditors would get $0," but because Lupton frequently conflated his identity with that of the LLCs during his testimony, his use of "I" here is ambiguous).

Although Mr. Lupton intends to continue overseeing the gyms, none of the other parties identified in Article 10.2 will have any management role in the debtors going forward. Mrs. Enger, Mrs. Lupton, and Mr. Cavanna have never been employed by the debtors and they will not contribute any assets to the reorganization. Mr. Lupton testified that neither he nor the debtors have had any conversations with Mr. Cavanna about his guaranty in the past three years. Mr. Enger testified that he has had no management role with Anytime Partners, LLC during its bankruptcy proceeding or within the last 18 months and that he intends to relinquish his 50% interest in the LLC upon confirmation. Although he plans to obtain a loan to make a $20,000 payment to Anytime Partners pursuant to the plan, Mr. Enger will not contribute any of his personal assets to the reorganization.

When Mr. Enger and Mrs. Enger were asked at the confirmation hearing what would happen if their guarantees were not released, each testified vaguely about the possibility of taking legal action against Mr. Lupton. Mr. Cavanna did not appear at the hearing or provide any testimony in support of the need for the release of his guaranty.

## F.    Plan Voting

Two classes of creditors voted to reject the plan: Class 2 (secured claims of Byline Bank) and Class 8 (unsecured Claims of Byline Bank, Geneva Capital, LLC, the Small Business Administration, and BRE Retail Residual Owner 5 LLC).[19]

---

[19] Class 8 consists of six claims: two held by Byline Bank, two held by Geneva Capital, one held by the SBA, and one held by BRE Retail Residual Owner 5 LLC. Only Byline Bank and Geneva Capital submitted ballots. Byline Bank, which holds more than half of the amount of the voting claims in this class, voted to reject the plan, while Geneva Capital voted to accept.

Of the remaining impaired classes, Class 3 (secured Claims of Geneva Capital LLC) and all four unsecured creditors in Class 7 (Big Hand, LLC, Cream City Property Management, LLC, David Taylor Fitness, LLC, and Fitness Ventures, LLC) returned ballots accepting the plan.

Although the plan identified Class 9, which consists of the unsecured claims of the Small Business Administration based on the PPP loan received by each debtor, as impaired, the debtors' ballot report states that the class is unimpaired and deemed to accept the plan. Mr. Enger testified that it is his understanding the PPP loans since have been forgiven.

## ANALYSIS

A plan filed under Subchapter V must include (1) a brief history of the debtor's business operations, (2) a liquidation analysis, and (3) projections regarding the debtor's ability to make plan payments, among other requirements. *See* 11 U.S.C. § 1190.

The statutory requirements for confirmation of a Subchapter V plan are contained in 11 U.S.C. § 1191. A plan may be confirmed as a consensual plan under § 1191(a), or as a nonconsensual plan under § 1191(b). To be confirmed under either provision, the plan must meet the requirements of section 1129(a)(1)–(7), (9), (11)–(14), and (16). A consensual plan also must meet the requirements of section 1129(a)(8) (each impaired class must accept the plan) and (a)(10) (there must be at least one accepting impaired class). If the debtor fails to satisfy either of those additional requirements, then the plan may be confirmed as a nonconsensual plan under § 1191(b), if the plan "does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan."

Because not all classes of impaired classes have accepted the plan, the debtors must seek confirmation under § 1191(b).

According to the U.S. Trustee, the debtors' plan cannot be confirmed for three primary reasons: (1) it is not feasible and therefore fails to satisfy the requirements of § 1129(a)(11); (2) it was not proposed in good faith and

therefore violates § 1129(a)(3); and (3) it provides for an impermissible release of non-debtor third parties.

Byline Bank also filed a limited objection to confirmation. While Byline does not oppose the general treatment of its claims, it objects to the provisions of Article 10 of the plan seeking injunctions and releases of non-debtor third parties and the extinguishment of liens on collateral that is not property of the estate. The Court will address the propriety of the plan's injunction and release provisions first.

## A.    Permissibility of Third-Party Releases and Injunctions

Both the U.S. Trustee and Byline Bank have objected to the provisions contained in Article 10 of the plan. According to the U.S. Trustee, the debtors have failed to demonstrate any rare or exceptional circumstances from which the Court could find that the releases in Article 10 are necessary or important for the reorganization, and therefore the Court lacks jurisdiction to impose the releases, which violate the Code (specifically, sections 524(e), 1129(a)(1), and 1141(d)). Byline likewise asserts that the debtors have failed to meet the "high bar" required for approval of such releases in the Seventh Circuit, adding that the provisions in Article 10 of the plan deprive Byline of its bargained-for state law liens and property rights.

What the parties refer to generally as the "third-party releases" in Article 10 of the plan are really three separate injunctive provisions. First, Article 10.1 operates as a permanent injunction, as of the confirmation date, against the enforcement of "all liens securing the claims against the Debtors, their Estates, or Guarantors." Second, the first sentence of Article 10.2 temporarily enjoins the debtors' creditors, after the plan is confirmed and "during the term of the Plan," from asserting any actions against Lawrence Lupton, Carolyne Lupton, Darren Enger, Laura Enger, and Dennis Cavanna or their property, in their capacities as co-debtors or guarantors of the debtor. Third, the second sentence of Article 10.2 serves as a permanent injunction, or release, of any claims of the debtors' creditors against the Luptons, the Engers, or Mr.

Cavanna, in their capacities as co-debtors or guarantors of the debtor, upon the successful completion of the plan. For clarity's sake, the Court will refer to these three separate injunctions as the lien release, the plan-term injunction, and the permanent release, respectively.

In the Seventh Circuit, a court may confirm a plan containing a nonconsensual third-party injunction or release only where the injunction or release is appropriately tailored and essential to the reorganization plan as a whole. *See Airadigm Commc'ns, Inc. v. FCC (In re Airadigm Commc'ns, Inc.),* 519 F.3d 640, 657 (7th Cir. 2008) ("In light of [sections 105(a) and 1123(b)(6)], we hold that this 'residual authority' permits the bankruptcy court to release third parties from liability to participating creditors if the release is 'appropriate' and not inconsistent with any provision of the bankruptcy code."); *In re Ingersoll, Inc.,* 562 F.3d 856, 864–65 (7th Cir. 2009); *In re GAC Storage Lansing, LLC*, 485 B.R. 174, 196–97 (Bankr. N.D. Ill. 2013) (analyzing Chapter 11 plan's temporary injunction against guarantor suits—which was to be effective "so long as the Reorganized Debtor is performing its obligations under the Plan and no[] Default has occurred"—under *Airadigm* and *Ingersoll*); *In re GAC Storage El Monte, LLC*, 489 B.R. 747, 767–68 (Bankr. N.D. Ill. 2013) (same).

Whether a third-party injunction or release is appropriate "is fact intensive and depends on the nature of the reorganization." *Airadigm*, 519 F.3d at 657. In *Airadigm*, the Seventh Circuit found that the third-party release at issue fit the bill because it was narrow in scope—it did not amount to "'blanket immunity' for all times, all transgressions, and all omissions," but instead applied only to claims "arising out of or in connection with" the reorganization itself and did not include "willful misconduct"—and it was essential to the reorganization as a whole, because the evidence established that the third party would not have provided financing essential to the reorganization without the release. *Id.*

In *Ingersoll*, the court approved of a similarly narrow third-party release—a release of the debtor's former owners from claims arising from or

relating to only two civil actions—as being consistent with the rule set forth in *Airadigm.* The court observed that the release was "far from a full-fledged 'bankruptcy discharge arranged without a filing and without the safeguards of the Code,'" and that the bankruptcy court had found that the release "was an 'essential component' of the plan, the fruit of 'long-term negotiations' and achieved by the exchange of 'good and valuable consideration' by the [former owners] that 'will enable unsecured creditors to realize distribution in this case.'" 562 F.3d at 865. The Seventh Circuit also "preached caution," however, noting that "[i]n most instances, releases like the one here will not pass muster under" *Airadigm*, and agreeing with the Second Circuit's observations in *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136 (2d Cir. 2005), that "[a] nondebtor release should only be approved in 'rare cases,' . . . because it is 'a device that lends itself to abuse.'" *Ingersoll*, 562 F.3d at 865 (quoting *Metromedia*, 416 F.3d at 141, 142).

In evaluating whether unusual circumstances exist that necessitate third-party releases, courts in other circuits have considered a number of factors, including the contributions made by the releasees, the claims to be released, what the releasing parties are getting in return for the released claims, and whether the exchange is ultimately fair. *See In re Aegean Marine Petroleum Network Inc.*, 599 B.R. 717, 728 (Bankr. S.D.N.Y. 2019) (citing *Class Five Nev. Claimants v. Dow Corning Corp. (In re Dow Corning Corp.)*, 280 F.3d 648, 58 (6th Cir. 2002)).

Here, the Court must examine the three injunctive provisions individually to determine whether each is "appropriate" in light of the guidance above.

### 1.  The lien release

Article 10.1 of the plan provides: "Except as otherwise provided by this Plan, all liens securing the claims against the Debtors, their Estates, or Guarantors shall be extinguished on the Confirmation Date." The language of this provision is ambiguous. The plan does not define the term "Guarantors,"

nor does it identify the specific lien-holders whose rights the plan will extinguish or the non-estate property subject to such liens. *Cf. Aegean Marine Petroleum*, 599 B.R. at 727 (court should be provided with enough information to assess the claims being released, see the direct connection between those claims and the contributions being made, and decide whether the rights of affected parties are being protected and whether the terms of the restructuring really depended on those releases). Similarly, the phrase "all liens securing the claims against the . . . Guarantors" could be read broadly to include *all* claims against the unidentified "Guarantors"—even those unrelated to guarantees of the debtors' debts.

Although the vague language of the plan itself is cause for concern, the debtors attempt to provide clarity in their post-hearing brief. They describe the liens to be extinguished as including "the Engers' mortgage" and "the judgment lien as a result of Lupton's guarantee." ECF No. 136, at 8. The former is a reference to Byline Bank's mortgage on the Engers' commercial real estate in Batavia, Illinois, while the latter appears to be "Big Hand LLC's judgment against Lupton." *Id.* at 9. Assuming, for the moment, that Article 10.1 applies to only those two lien-holders, and because Big Hand has agreed to release its judgment lien, the only nonconsensual release at issue is of Byline's mortgage on the Engers' real estate.

The debtors argue that this release is necessary to enable Mr. Enger to make the $20,000 contribution required by the plan. *See id.* ("[Mr. Enger] has arranged shortterm financing to make the contribution, but that the financing is contingent upon its repayment within 60 days for which he will need to refinance his real estate, which is the collateral for Byline's mortgage."). There are a few problems with this argument. First, the debtors provided no evidence directly linking Mr. Enger's ability to contribute the $20,000 to the extinguishment of Byline's mortgage. Mr. Enger does not intend to make the payment with funds obtained from refinancing his property; instead, his "close" acquaintance purportedly has agreed to lend him the funds on the condition

that they be repaid within 60 days. Enger testified that he would *prefer* to repay those funds by refinancing the real estate on which Byline has a mortgage, because that way he could do so "without disrupting [other business operations] and withdrawing cash advances, credit cards, and etc." By his own admission, he has alternate—albeit less palatable—methods of obtaining such funds.

In addition, there was no testimony that Mr. Enger's unnamed associate agreed to loan him the money on the sole condition that Enger repay the funds with proceeds from refinancing—which is the ostensible reason the lien release is necessary. If that *were* the case, there is no assurance Mr. Enger would be able to satisfy that condition; there is nothing in the record to corroborate Mr. Enger's expectation that the extinguishment of Byline's lien will enable him to refinance his property and repay the $20,000 he borrowed within 60 days. Regardless, whether Enger is able to repay his personal loan in the way he envisioned (or even agreed) is of no consequence to the Court or the performance of the debtors' plan. Once Enger makes his $20,000 contribution, his involvement in the reorganization will conclude; he cannot "take back" the $20,000 if the refinancing fails to occur, or if he is unable to satisfy his own personal debts. On this record, there is nothing necessary or essential about Byline releasing its mortgage on the Engers' commercial real estate.

Moreover, the $20,000 contribution itself is hardly a critical component of the reorganization, from a purely mathematical perspective. Over the life of the three-year plan, the debtors propose to pay creditors approximately $675,000 ($275,000 on secured claims, and $400,000 on unsecured claims, including administrative expenses), of which Enger's proposed contribution represents less than 3%. *Cf. Airadigm*, 519 F.3d at 657 (without the involvement of the third-party financier, the reorganization "simply would not have occurred," because the debtor would have been on the hook for over $221 million in debt—"an amount that some other would-be financier would not likely [have paid] considering [the debtor's] financial situation").

But the release is not appropriate for other reasons. Mr. Enger testified that the real property at issue has perhaps $80,000 in equity, to which Byline's mortgage currently attaches. Of that, Mr. Enger proposes to pay only $20,000 into the plan, meaning he will retain a benefit of $60,000 (in addition to the release of his personal liability on several guarantees, as provided in Article 10.2 of the plan, discussed below). Byline itself will not receive the $20,000 paid into the plan; those funds instead will be used to satisfy administrative fees and lump-sum payoffs to consenting creditors. In other words, the Court cannot see any benefit or value that Byline is receiving in exchange for relinquishing its rights in $80,000 of equity in non-debtor property. Plainly, the release is not "the fruit of long-term negotiations." *Ingersoll*, 562 F.3d at 865.

For all these reasons, the Court cannot find that the nonconsensual extinguishment of Byline Bank's mortgage on the Engers' real estate is appropriate or essential to the reorganization.

### 2. The plan-term injunction

The first sentence of Article 10.2 of the plan provides:

> Except as provided for by this Plan, after the Confirmation Date, all holders of claims against the Debtors or their assets are enjoined from any actions against Lawrence Lupton, Carolyne Lupton, Darren Enger, Laura Enger, and Dennis Cavanna or their property as co-debtors or guarantors of the Debtors, during the term of the Plan.

As previously explained, the Luptons, the Engers, and Mr. Cavanna have guaranteed debts to the following creditors: Byline Bank; Geneva Capital; BRE Retail Residual Owner 5 LLC; DHCH Properties, LLC; Big Hand, LLC; David Taylor Fitness, LLC; and Fitness Ventures, LLC. Of these creditors, the latter three and Geneva Capital have consented to the proposed injunctions and submitted ballots accepting the plan. In addition, Mr. Lupton's guaranty of the debt owed to DHCH Properties, LLC remains unaffected by the plan, according to the terms of Article 6. *See* Ex. 105, at 11 ("The personal guarantees associated with the assumed leases and executory contracts shall remain unaffected by the Plan."). As a result, the only nonconsensual injunctions that

Article 10.2 of the plan would effect apply to the guarantees of debts owed to Byline Bank (guaranteed by Mr. Lupton, Mr. Enger, and Mrs. Enger to the extent of her interest in the Batavia, Illinois commercial property), and BRE Retail Residual Owner 5 LLC (guaranteed by Mr. Lupton, Mr. Enger, and Dennis Cavanna).[20]

As noted above, courts have applied the rules established in *Airadigm* and *Ingersoll*—that a third-party release must be (1) narrowly tailored and (2) essential to the reorganization—to analyze whether plan-term (temporary) injunctions are appropriate. *See In re GAC Storage Lansing*, 485 B.R. at 196–97; *In re GAC Storage El Monte*, 489 B.R. at 767–68. The debtors assert that Article 10.2 passes the first prong of this test because it is limited to claims against the five identified parties, and only in their capacities "as co-debtors or guarantors of the Debtors," so it does not provide "blanket immunity" or operate as a full-fledged bankruptcy discharge like the kind of provisions frowned upon in the Seventh Circuit.

As for the question of necessity, the debtors assert that Lupton needs to focus his efforts solely on running the gyms during the term of the plan, or else the reorganization will fail and creditors will go unpaid. *See, e.g.*, ECF No. 136, at 7 ("The continued operation of the Debtors (as consolidated into Lupton Consulting, LLC) and the ability of the Debtors to generate net profits in order to pay their creditors is wholly dependent upon Lupton."). The debtors go on:

> If the non-consenting unsecured creditors are not stayed from pursuing Lupton during the term of the Debtors' plan, the distraction would be detrimental to the ability of the Debtors to successfully perform under the Plan. *Without the assurance that the successful performance of the Plan will release his guarantee to the Debtors' creditors,* Lupton has little incentive allow the Debtors to continue to operate his franchises or to manage the Debtors, which would cause the Plan to fail and result in the Debtors' creditors receiving nothing. . . .

---

[20] Although BRE Retail did not vote to reject the plan, a failure to cast a ballot is not consent. *See, e.g., In re Sabbun*, 556 B.R. 383, 388 (Bankr. C.D. Ill. 2016); *In re Vita Corp.*, 358 B.R. 749, 751 (Bankr. C.D. Ill. 2007), *aff'd*, 380 B.R. 525 (C.D. Ill. 2008).

> Because the Debtors are so under-staffed, Lupton needs to focus all of his attention to operating the Debtors. If he is distracted by litigation, the Debtors will not be profitable and will be unable to make payments to their creditors. The stay of actions during the pendency of the Plan *and the permanent release of a guarantee* will not protect the Debtors' ability to perform under the Plan if Lupton must still defend himself from contribution claims made by his co-guarantors.

*Id.* at 8 (emphasis added).

Here, the debtors' argument begins to unravel. Instead of addressing the two discrete injunctions in Article 10.2 separately, the debtors conflate the provisions, muddling the justification and necessity for each. Even assuming that Lupton requires some "breathing room" from guaranty suits to ensure plan completion—which the debtors have failed to prove, as discussed below—the necessity for an injunction *during the term of the plan* to allow Lupton to focus on operating the gyms is not a justification for the separate *permanent* release after successful performance. On this point, the debtors appear guilty of making what Byline characterizes as a "take my ball and go home" argument, or what the U.S. Trustee likens to demanding a release as a "trophy" or a "merit badge" for making a positive contribution to the reorganization. *See* ECF No. 135, at 5; ECF No. 134, at 15 (quoting *Aegean Marine*, 599 B.R. at 723 ("[T]hird-party releases are not a merit badge that somebody gets in return for making a positive contribution to a restructuring. They are not a participation trophy, and they are not a gold star for doing a good job. Doing positive things in a restructuring case—even important positive things—is not enough. Nonconsensual releases are not supposed to be granted unless barring a particular claim is important in order to accomplish a particular feature of the restructuring.")).

As for the evidence purportedly establishing the need for the plan-term injunction, Mr. Lupton's testimony does not substantiate the debtors' claims. To the extent Lupton provided any rationale for the provisions in Article 10 of the debtors' plan, he focused solely on the need for the permanent release, and

justified it on grounds of "fairness."[21] There is no evidence of, for example: (1) any concrete threat of a guaranty suit against Lupton (or the other guarantors) during the term of the plan—indeed, neither Byline nor BRE Retail have attempted to enforce their guarantees during this case so far; (2) the practical effect that any such suit would have, including the ways in which it would "distract" Lupton and presumably decrease the gyms' operating revenues and ability to make plan payments; and (3) the cost to the debtors of hiring additional employees, to the extent Lupton is unable to devote time to the gyms while defending such suits.

Similarly, if Lupton believes he is entitled to compensation in exchange for allowing the debtors to operate the franchises he owns, such compensation should come from the debtors and their operating revenues—not as a cost to be borne solely by Byline and BRE Retail in the form of a nonconsensual release of guarantees.[22] And while the debtors assert that the injunctions and releases of the other co-guarantors are necessary to protect Mr. Lupton from possible contribution suits, the possibility of such suits is speculative, at best. The Engers vaguely alluded to possible claims against Lupton should they be

---

[21] When asked whether the reason for the injunction provision is because he does not want to deal with lawsuits (over the guarantees), Lupton responded: "No . . . . COVID has caused a myriad of issues for us. We had contracts with members to stay with our club that we released, because of COVID. We're asking for the same sort of respect. So, when we can't operate a business and we get shut down and we can't pay our rent because we have no income coming through, it only makes sense to release guarantees in that respect."

[22] *See, e.g., Aegean Marine*, 599 B.R. at 729 ("If the argument is that the directors have done a spectacular job, then maybe they should ask for a bonus, and maybe they would be entitled to one. At least such a bonus would be payable by the entities for whom the relevant directors did their work. When the Debtors argue that the audit committee members have earned peace of mind here, they essentially are saying that the audit committee members should be given a bonus that would not be paid by the Debtors, but that instead would be involuntarily assessed against the third parties who own the claims to be released. . . . This is not a proper way to reward good work. . . .  [T]he directors did what they were paid to do, and that does not mean they are entitled to releases of third-party claims, particularly when those releases really are not necessary or important to the accomplishment of the restructuring transactions.") (citing, *inter alia, Nat'l Heritage Found., Inc., v. Highbourne Found.*, 760 F.3d 344, 348 (4th Cir. 2014) (services by officers and directors did not constitute the sort of contribution that would justify third-party releases; *Gillman v. Continental Airlines (In re Cont'l Airlines)*, 203 F.3d 203, 215 (3d Cir. 2000) (denying approval to third-party releases of claims against officers and directors when there was no evidence that the success of a reorganization bore any relationship to the proposed releases)).

pursued on their guarantees, and Mr. Cavanna did not make an appearance or give testimony.

Nor have the debtors offered any argument or evidence as to how the proposed injunction otherwise satisfies the criteria for injunctive relief under section 105(a) generally. *See, e.g., GAC Storage El Monte*, 489 B.R. at 769–70 (entry of injunction in favor of nondebtor party in Chapter 11 plan may be appropriate where there is reasonable likelihood of successful reorganization, the court balances relative harm between debtor and creditor who would be restrained, and the court considers the public interest, balancing public interest in successful bankruptcy reorganizations with other competing societal interests) (citing *Gander Partners, LLC v. Harris Bank, N.A.,* (*In re Gander Partners, LLC* ), 432 B.R. 781, 788 (Bankr. N.D. Ill. 2010), *aff'd,* 442 B.R. 883 (N.D. Ill. 2011) (noting that an injunction restraining creditors from proceeding against nondebtors is justified only if creditor actions in that regard would frustrate the debtor's reorganization efforts by distracting the guarantors from reorganizing the debtor)); *see also In re Caesars Ent. Operating Co., Inc.*, 561 B.R. 441, 451 (Bankr. N.D. Ill. 2016) (to obtain a pre-confirmation injunction under section 105(a), debtor must show that there is likelihood of a successful reorganization, and that the injunction would serve the public interest).

The same goes for the debtors' arguments about the injunctions and releases of the other co-guarantors, which are predicated on Mr. Lupton's necessity to the reorganization, and therefore must rise and fall with their arguments vis-à-vis Mr. Lupton's guarantees. *See, e.g.,* ECF No. 136, at 8 ("In order for Lupton's injunction and eventual release to be meaningful, it must be complete. Because he is a co-guarantor with all of the other Guarantors, it will not be complete unless it includes an injunction and the release of his co-guarantors along with the extinguishment of the liens (whether the Engers' mortgage or the judgment lien as a result of Lupton's guarantee) securing those guarantees.").

There are other problems with Article 10.2 of the plan. It enjoins guarantor suits "during the term of the [P]lan." The "plan term" is not defined, but arguably could mean either the three-year period during which payments are to be made on unsecured claims or the seven-year period during which secured claims are to be repaid. What happens if there is a default on payments during this undefined period of time? The plan does not say. Under the plain language of Article 10.2, even if the debtors fail to comply with the terms of the plan, creditors must wait until the end of the "plan term" to enforce their third-party guarantees.

For all these reasons, the debtors have failed to meet their burden of demonstrating that the proposed injunction, as drafted, is appropriate under the applicable law.

### 3. The permanent release

The second sentence of Article 10.2 of the plan provides for a permanent release of guarantor liability:

> Except as provided for by this Plan, upon the successful completion of the Plan, all holders of claims against the Debtors or their assets are permanently enjoined from any actions against Lawrence Lupton, Carolyne Lupton, Darren Enger, Laura Enger, and Dennis Cavanna or their property as co-debtors or guarantors of the Debtors.

As previously explained, the debtors offer the same rationale in support of both the temporary injunction and the permanent release. The justification carries even less weight here. Permanent releases are warranted in only very rare and unique circumstances. As counsel for Byline summarizes, small business debts are routinely guaranteed by small business owners:

> [T]he circumstances surrounding the guarantees and mortgage at issue cannot, almost by definition, be unique or extraordinary. The Court can take its own notice that nearly every case involving a small business loan involves guarantees from its principals. As such, the circumstance complained of by the Debtors is the same circumstance faced by nearly every small business Chapter 11 debtor and its principals. Fundamentally then, if the potential discomfort or financial risk of guarantying a loan, or the inherent

inter-guarantor contribution or indemnity claims which may come with such a guaranty can support a non-consensual third-party release, then the Court will see them in each and every small business Chapter 11. As such, the relief sought is not truly unusual, unique or extraordinary, and on its face cannot meet the *Aradigm* and *Ingersoll* standard.

ECF No. 135, at 4. The U.S. Trustee echoes this concern:

Granting the non-consensual third-party releases contemplated in the Debtors' Plan would set a precedent that this Court condones the practice of [] non-debtor[s] simply buying their own quasi-discharge without themselves being a debtor in bankruptcy. Such a precedent would have wide-reaching negative public policy implications. . . . Based on the factual record before the Court and applicable legal precedent, there is no basis for this Court to grant the non-consensual third-party injunctions and releases proposed in the Plan.

ECF No. 134, at 15.

Allowing for the release of a business owner's guaranty because he continues to run the business after a reorganization would turn the exception into the rule. It is an even greater stretch to say that *Airadigm* and *Ingersoll* allow for the releases of *other* parties who will have even less of a role in the reorganized debtor (or none at all), and who do not contribute substantially to the reorganization.

On the record before it, the Court cannot conclude that the third-party releases in Article 10.2 of the plan are "appropriate" in light of Seventh Circuit precedent, and therefore the Court cannot confirm the plan with proposed injunctions and releases.

## B.    Feasibility

Section 1129(a)(11) requires the debtor to demonstrate that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan." 11 U.S.C. § 1129(a)(11). This is known as the "feasibility" requirement. "The feasibility requirement mandates that the plan proponent offer concrete evidence of sufficient cash flow to fund and maintain

both its operations and its obligations under the plan." *In re Multiut Corp.*, 449 B.R. 323, 347 (Bankr. N.D. Ill. 2011) (citing *Coones v. Mut. Life Ins. Co. of N.Y.*, 168 B.R. 247, 255 (D. Wyo. 1994), *aff'd*, 56 F.3d 77 (10th Cir. 1995)). A debtor need not show that a plan is guaranteed to succeed; "[o]nly a reasonable assurance of commercial viability is required." *In re 203 N. LaSalle St. P'ship*, 126 F.3d 955, 961–62 (7th Cir. 1997), *rev'd on other grounds*, 526 U.S. 434 (1999). "The central inquiry is 'whether there is a reasonable probability the provisions of the plan can be performed.'" *In re Olde Prairie Block Owner, LLC*, 467 B.R. 165, 169 (Bankr. N.D. Ill. 2012) (quoting *In re G–I Holdings Inc.*, 420 B.R. 216, 267 (D.N.J. 2009)); *see also Chase Manhattan Mortgage & Realty Trust v. Bergman (In re Bergman)*, 585 F.2d 1171, 1179 (2d Cir. 1978) ("Under the test of feasibility, the court 'views the probability of actual performance of the provisions of the plan. Sincerity, honesty, and willingness are not sufficient to make the plan feasible, and neither are any visionary promises. The test is whether the things which are to be done after confirmation can be done as a practical matter under the facts.'").

In assessing feasibility, courts have considered factors including the company's earning power, the sufficiency of the capital structure, economic conditions, managerial efficiency, and whether the same management will continue to operate the company. *In re Am. Consol. Transp. Companies, Inc.*, 470 B.R. 478, 490 (Bankr. N.D. Ill. 2012). *See also In re Polytherm Indus., Inc.*, 33 B.R. 823, 831 (W.D. Wis. 1983) ("Feasibility has been defined further in bankruptcy proceedings to require examination of the adequacy of the capital structure; the business's earning power; economic conditions; management's ability; the probability of the present management's continuation; and any other factors related to the successful performance of the plan.").

The U.S. Trustee contends that the plan is not feasible because (1) Mr. Enger's contribution (in conjunction with a vague asset sale) is uncertain, and (2) the debtors' financial projections are not reliable.

As for Enger's contribution, there is little evidence substantiating his ability to make the $20,000 payment. For example, the debtors provided no proof of a binding agreement such as commitment letter from the acquaintance who agreed to loan Enger the money, nor any evidence of his unnamed friend's ability to make the loan. The contribution becomes even less likely given the Court's decision on the propriety of the lien-release provision of the plan, *see supra* Section A.1. *See In re Made in Detroit, Inc.*, 299 B.R. 170, 177–80 (Bankr. E.D. Mich. 2003), *aff'd,* 414 F.3d 576 (6th Cir. 2005) (debtor's proposed Chapter 11 plan, which was contingent on lender's making a $15 million loan for development of debtor's real estate, which was itself contingent on debtor's payment of commitment fee that still had not been paid at time of confirmation hearing and upon lender's appraisal of property at figure substantially in excess of value suggested by disinterested appraiser, was not "feasible" and could not be confirmed). But, as noted earlier, Enger's proposed contribution is less than 3% of the proposed plan payments—its importance is more relevant to timing.

More pervasively significant to the feasibility analysis is that the debtors' financial projections stand on shaky ground. In briefing and during the confirmation hearing, the U.S. Trustee pointed out several ways in which the debtors' plan projections do not reflect reality. First, the plan projections overestimate the amount of the debtors' monthly cash totals. While the projections anticipate $115,417.64 in cash at the end of May 2021, the debtors' monthly operating reports show only $93,252.23. And the plan projects cash on hand in June 2021 of $127,271.21—excluding the proposed $20,000 cash contribution from Darren Enger—while actual June cash totals were $115,052.14. On the effective date of the plan, the debtors are required to make a lump-sum payment of $125,805 (although the plan contains a math error and calculates that amount as $123,805). Without the (speculative)

contribution from Enger, the debtors will not have enough money to make the payment, let alone a reserve surplus for continued operations.[23]

Second, several categories of the debtors' expense projections are not borne out by the available historical data. For example, the plan projections do not include any budget for equipment, while the average of actual expenses designated as "equipment" in the debtors' January through May 2021 monthly operating reports (after removing income of $26,643.78 that the debtors received in April as an annual "enhancement fee" from dues collected from members expressly for the purpose of equipment purchases, plus the corresponding expenses) was $6,407.51. This deficit is significant, as equipment is a key expense. The debtors respond that, as of June 30, 2021, there are 2,890 members at the debtors' three gyms,[24] so if they collect the $30.00 enhancement fee from each member, that would result in $86,700 annually for purchase of replacement equipment, and "[e]ven if the Debtors collect only half of the Club Enhancement Fees, the feasibility concerns raised by the United States Trustee are fully addressed." But the debtors do not support this assertion with any evidence establishing that, even assuming they collect an annual enhancement fee of $86,700 (of which there also is no evidence as to collectability—and given that the amount received in 2021 was just under $27,000, such a substantial increase seems unlikely), the amount would be sufficient to cover yearly equipment expenses. For example, there is no testimony or documentation regarding historical yearly equipment expenses, or the condition and expected useful life of the current equipment at the gyms.

---

[23] The debtors respond that these variations in amount are not significant, and that the trend for membership revenue is increasing, thus smoothing out any near-term shortfalls, see below. But the payments due under the plan on the effective date are not insignificant, and cannot wait for "smoothing out" over future months.

[24] In a direct response to a question about membership, Lupton testified: "[Membership is] kind of a mixed bag. COVID is a once-in-a-lifetime event, so we're managing as best we can. We've grown West Allis and Milwaukee to numbers that are better than before COVID. Hartland, we are still down 200 members, so, we're hanging in there, we're steady with Hartland, but its teetering, so we're barely profitable there."

In addition, Mr. Lupton testified that the "repairs and maintenance" budget line item of $900 per month may not be sufficient for equipment and property repairs, and that he may use his personal credit accounts to purchase equipment. The projections also do not include a budget for "miscellaneous expenses," while the debtors' monthly operating reports included a line item for miscellaneous expenses for taxes, licenses, advertising, sales costs, and banking fees that averaged $1,037 per month. ECF No. 122-5 (Ex. 104). Nor do they include any identified expenses for general liability insurance. Ex. 105, at 17.

In all, the U.S. Trustee calculated that the debtors' monthly expenses are on average $20,757 higher than projected in their plan. Ex. 104. Extrapolated over the life of the plan, this results in a shortfall of between $82,837.13 and $100,639.23.[25] ECF No. 129 (Ex. 119). The debtors do not explain the discrepancies between their projections and historical expenses, nor do they challenge the U.S. Trustee's calculations. Instead, they respond by suggesting that the projections are accurate because creditors have accepted them, and describe the potential shortfall as insignificant:

> The estimates in the Debtors' projections are undoubtedly conservative but have been accepted by the Debtors' two main creditors, Byline and Geneva Capital, LLC ("Geneva"), both of whom are relying on those projections for the continued payments on their secured claims and the annual payments on their unsecured claims.

> While this case has been pending, the Debtors' income and expenses have regularly exceeded their budgeted amounts. Two of the Debtors' gyms, those in Milwaukee and in West Allis, have grown more than anticipated, which has generated both additional profits and additional expenses.

---

[25] The debtors' plan projections estimate the unsecured portion of Byline's claims to be paid through the plan as $452,018.50, while the total claim amounts identified in the ballots Byline submitted result in unsecured claims of $423,532.46, which reduces the total amount to be paid on Byline's unsecured claims over the life of the plan by $7,121.51. At the same time, the debtors admit that they included an incorrect amount for Geneva's unsecured claim in the plan projections, *see* ECF No. 136, at n.4, and will need to pay an additional $14,935.35 over the term of the plan. This results in a net increase in payments of $7,814, so the shortfall, according to the U.S. Trustee's calculations, could be over $108,000.

. . .

> According to the estimates supplied by [] Ms. Guillermo, the United States Trustee predicts that the Plan will be underfunded by $82,837.13 during its term. Even if this projection were accurate, the shortfall is an insignificant amount given the anticipated $3,863,618.98 of revenues in her projection and could easily be overcome by the Debtors during the pendency of the Plan. Moreover, this projection underestimates the starting cash position of the Debtors upon the Effective Date of the Plan by at least $35,000, based on the cash position of the Debtors at the end of June 2021.

ECF No. 136, at 10-11 (internal citations omitted).

The debtors' hopes and vague allusions to making up a deficit in some unidentified manner over the course of three years cannot substitute for actual financial data, even accepting that the feasibility analysis requires predictions based on a "snapshot" in time. *Cf. In re Olde Prairie Block Owner*, 467 B.R. at 169–70 ("the feasibility test 'is firmly rooted in predictions based on objective facts'"; "'[w]here the projections are credible, based upon the balancing of all testimony, evidence, and documentation, even if the projections are aggressive, the court may find the plan feasible. Debtors are not required to view business and economic prospects in the worst possible light'"); *203 N. LaSalle St. P'ship*, 126 F.3d at 962 ("A plan need not be assured of success to be confirmed."). Mr. Lupton's testimony that he may use his personal credit cards to purchase equipment portends more of the same "robbing Peter to pay Paul" financing that contributed to the debtors' pre-filing financial straits. On the record before it, the Court cannot conclude that the debtors have met their burden to prove that the plan, as drafted, is feasible.

## C.     Good Faith

The Bankruptcy Code requires that a debtor's plan be "proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). Good faith is "generally interpreted to mean that there exists 'a reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Bankruptcy Code.'" *In re Madison Hotel Assocs.*, 749 F.2d 410, 425 (7th

Cir. 1984). In determining whether a plan has been proposed in good faith, "the focus of the inquiry is the plan itself, which must be viewed based on the totality of the circumstances surrounding the development and proposal of that plan." *In re Multiut Corp.*, 449 B.R. at 341–43 (failure of proposed Chapter 11 plan to adequately reserve claims and causes of action that debtor might have against third parties, including insiders, and to accurately state value of unsecured claims, plus plan's substantially inaccurate calculation of its minimum percentage distribution to unsecured creditors demonstrated that plan was not proposed in good faith).

The U.S. Trustee contends that the plan was not filed in good faith, as evidenced by: (1) initially undisclosed insider transactions (including Lupton's use of the debtor's EIDL loan funds for personal expenses); (2) the plan's failure to provide for payments to all creditors; (3) inaccuracy of the debtors' projected expenses (*see supra* Section B); and (4) excessive personal expenses of insiders.

The U.S. Trustee is correct that the debtors initially failed to disclose prepetition payments made for the benefit of an insider, as well as the full amount of payment Mr. Lupton received, in SOFA questions 4 and 30. In addition, Mr. Lupton admitted to having transferred at least $7,000 in EIDL funds to his personal bank account, which he presumably used for personal expenses. The debtors' failure to accurately disclose prepetition insider transfers, as well as the inability to trace the use of all of the EIDL proceeds, appears primarily due to Mr. Lupton's poor record-keeping practices, combined with his use of personal loans to fund business expenses (including the 2019 opening of the West Allis gym and the 2020 expansion of the Milwaukee gym), as well as the existence of multiple business and/or personal bank accounts, between which he moved funds back and forth as needed to pay either business or personal expenses.

The debtors concede that Lupton "could have done a better job tracking his investments into the Debtors and segregating his personal expenses from Lupton Consulting LLC's business expenses," but assert that his failure to do so was "harmless" and "ultimately resulted in [] two profitable gyms that are

attempting to pay back the debts of three closed gyms and one gym that is only breaking even." ECF No. 136, at 10. Perhaps Lupton's interchangeable use of business and personal accounts was not, in itself, a sign of bad faith—for example, he apparently treated the $7,000 in EIDL funds as a loan from the debtor, to be repaid later with his own money[26]—it certainly was not harmless. The lack of records to corroborate the source and use of funds transferred between the debtors and Mr. Lupton make it impossible to verify that, as the debtors allege, "the transfers could not be avoided because of the defenses allowed in 11 U.S.C. § 547(c)(1) and (2)."

The U.S. Trustee also is correct that the plan does not provide for all prepetition claims. The debtors' law firm holds a prepetition claim of almost $6,200 combined against both debtors. Rather than provide for this as a general unsecured claim (on which other claimants—as least those in Class 9—are receiving only 25%), the plan appears to contemplate paying this amount in full, as an administrative expense. The debtors offer no rationale for providing preferable treatment to the general unsecured claims of their general bankruptcy counsel. A plan that unfairly discriminates against the general unsecured creditors in Class 9 (which did not accept the plan) cannot be confirmed. *See* 11 U.S.C. § 1191(b); *In re Multiut Corp.*, 449 B.R. at 351 ("In order to determine if a Plan unfairly discriminates in violation § 1129(b)(1) [which is analogous to § 1191(b)], one must show that (1) there is a legally acceptable rationale for such discrimination and (2) the discrimination is necessary in light of the rationale.")[27] The plan likewise does not provide for payment of the IRS's claim against Anytime Partners, LLC. Without any objection or evidentiary proof that the IRS claim is invalid, the plan cannot be

---

[26] It also is possible that some of the $7,000 was used in the Milwaukee gym expansion in 2020, or that Lupton used some of the funds for personal expenses when the gyms were shut down temporarily by the COVID pandemic and revenue was slow or nonexistent.

[27] Notably, the plan also provides more favorable treatment to the unsecured portion of the claim of Mercedes-Benz Financial Services, LLC ($1,312.08), which the debtors intend to pay in full as part of Class 4.

confirmed unless it includes a provision for the claim.[28] *See* 11 U.S.C.
§ 1129(a)(7), (9).

As a final basis for his "bad faith" argument, the U.S. Trustee asserts
that the debtors have failed to reduce excessive expenses, to the detriment of
their creditors. First, the debtors intend to continue spending $4,182 in
monthly auto payments and for insurance for three luxury vehicles (a Lexus
and two Mercedes, the latter two of which Mr. Lupton represented were
primarily for personal and household purposes when he signed the relevant
agreements), resulting in an annual automobile expense of $50,184. That
amount is equivalent to an annual mileage reimbursement of nearly 90,000
miles based upon the 2021 IRS rate of $0.56 per mile. According to the U.S.
Trustee, this large annual expense, incurred for the benefit of the debtors'
principal and his non-employee family members, is not reasonable and
indicates a lack of good faith. In support, the U.S. Trustee cites *In re Osborne,*
No. 12-00230-8-SWH, 2013 WL 2385136, at *6 (Bankr. E.D.N.C. May 30,
2013) ("If a high income debtor's plan provides for the use of such income to
make heavy mortgage payments on a lavish house, to pay for luxury cars, and
to generally support an extravagant lifestyle, the plan may not meet the
confirmation requirements of 11 U.S.C. § 1129(a).") (citing *In re Fernandez*, 97
B.R. 262, 263 (Bankr. E.D.N.C. 1989)).

*Osborne* is not directly on point because it involved *individual* Chapter 11
debtors, enriching themselves through excessive and unnecessary personal
expenses. Here, Lupton provided testimony that the vehicles at issue are used,
at least in some part, for business purposes: Lupton, his wife, and his teenage
son use them to travel between the clubs for purposes of cleaning (and, at least
for the son, to work out). But, to the extent that Lupton and his family
obtained the vehicles for personal/family purposes and use them primarily in
that way, *Osborne* suggests that it is unreasonable for the debtor to be footing

---

[28] Lupton testified that he thought the IRS would be refunding the debtor approximately
$5,000, instead of the debtor owing taxes. But that statement is not the type of evidence
needed to satisfy Code requirements.

the bill for the Luptons' luxury vehicles at the expense of unsecured creditors—particularly when the plan proposes to release Lupton from his guarantees of significant amounts of unsecured debt. *See Osborne,* 2013 WL 2385136, at *10 ("[T]he notion of a debtor receiving the privilege of a chapter 11 discharge, while making meager repayment to creditors and enjoying what many would view as a 'privileged' lifestyle, is likely to offend the integrity of the bankruptcy system and send the wrong message to the public.").

The debtors' plan projections also provide for the payment of Mr. Lupton and his family members' cell phone bills totaling between $500 and $600 per month, as well as annual salary payments to Mr. Lupton of nearly $120,000. In all, Mr. Lupton will receive compensation and benefits of nearly $177,000 annually. It is questionable whether a plan that preserves the comfortable lifestyle of a debtor's insiders while providing unsecured creditors a fraction of their claims demonstrates "fundamental fairness in dealing with one's creditors." *In re Multiut Corp.*, 449 B.R. at 342.

The debtors respond that Lupton Consulting, LLC provides cars to Lupton and his family to drive in return for their work cleaning the gyms, and that the car payments are significantly less than the cost the debtors would incur by hiring additional vendors or adding a cleaner to their staff. But the debtors do not support this statement with any evidence. Mr. Lupton testified that his wife and son do not track their hours cleaning the gyms, so there is no way to gauge whether the "payment" for that work via use of the cars is reasonable in relation to the amount of time worked. Nor was there any evidence or testimony about the added cost of hiring a new staff member as compared to the monthly luxury car payments. Although Lupton testified that the gyms employ two part-time cleaners, who come "a couple times a week," at a monthly cost of about $1,600, he did not provide further details, such as an hourly rate, or the amount of time per week that the cleaners spend cleaning the gyms.

Not all infeasible plans are proposed in bad faith. The good faith inquiry looks at the process of proposing the plan, as well as the accuracy or Code-

compliance of its substance. Here, it took some months and several extensions for the debtors to file their plan. Its goal, as the debtors' counsel put it, is to have "two profitable gyms . . . attempting to pay back the debts of three closed gyms and one gym that is only breaking even." ECF No. 136, at 10. But the totality of the circumstances, including plan details, do not go far enough to ensure a reasonable likelihood that the plan will achieve its end consistent with the purposes of the Bankruptcy Code.

The lack of clear financial records permeates the plan deficits. Lack of records makes it impossible to trace and verify substantial transfers between the debtors and Mr. Lupton. The lack of clear financial records, while mainly predating the proposed plan, also undercuts the debtors' argument that prepetition transfers cannot be avoided so as to contribute additional plan dollars for creditors. The plan fails to provide for two prepetition claims: the known claim of the debtors' counsel, and the unsettled amount of the IRS's claim. The debtors give no explanation for these omissions, even if their likely dollar value is not substantial. More worrisome, the Court finds that some of the funds to be paid to insiders—in particular Mr. Lupton's wife and son— appear excessive. The debtors failed to establish that the value of the full-time use of a luxury car and paid cell phone equals the wage of an outsider to clean the gyms several hours each week. Similarly, Mr. Lupton's use of the same perks, while undoubtedly facilitating his divided, heavy workload between the clubs, comprises part of a very comfortable compensation and benefit package prioritized against the fractional distributions to unsecured creditors and the permanent release of outsider liens. Considering all of these aspects, the Court cannot conclude that the plan was filed in good faith as the law understands that term, and as members of the public would perceive it.

## CONCLUSION AND ORDER

Much of the story of these Chapter 11 cases is tied to the unforeseen financial havoc caused by the COVID-19 pandemic and government-enforced shutdown. But that is not the whole story. Unfortunately, the whole story is

not fully ascertainable, given the lack of records to document the multiple transfers between the debtors' and Mr. Lupton's various bank accounts and credit cards. And, well before the pandemic hit, Mr. Lupton and his fellow guarantors had assumed loan guaranties that are common to small businesses, meaningful to creditors, but onerous and enduring for the signers. Combined, these circumstances make it difficult to craft a feasible, Code-compliant plan of reorganization. For now, the Court must deny confirmation based on the improper injunctive provisions, demonstrated infeasibility, and a lack of good faith in proposing and grounding the various terms.

Accordingly, and for the foregoing reasons,

IT IS HEREBY ORDERED that confirmation of the debtors' joint plan of reorganization is DENIED.

Dated: August 31, 2021

By the Court:

Beth E. Hanan
United States Bankruptcy Judge